IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division
2018 MAR 26 P 4:06

| | | |
|---|---|---|
| **EDDIE MURPHY, #306651,** | * | |
| Plaintiff, | * | |
| v. | * | Case No.: GJH-16-3092 |
| **CHRISTOPHER ORTT, COII,** | * | |
| **LT. WILLIAM GILLUM,** | | |
| **NICHOLAS SOLTAS, COII,** | * | |
| **CRAIG PETERS, COII,** | | |
| **KRISTI CORTEZ, RN,** | * | |
| **UNKNOWN CORRECTIONAL** | | |
| **OFFICERS,**[1] | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Pending before the Court is *pro se* Plaintiff Eddie Murphy's Complaint filed pursuant to 42 U.S.C. §1983. ECF No. 1. Murphy's allegations are premised on events that occurred when he was an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. *Id.* Murphy alleges, among other complaints, that excessive force was used against him, that he was not properly treated for the effects of pepper spray, and that NBCI employees fabricated rule violations against him. *Id.* Defendant Krissi Cortez, R.N., has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 15, in response to which Murphy has filed an opposition, ECF No. 19. Defendants, former C.O. II Christopher Ortt,[2] C.O. II Craig Peters, Lt. William Gillum, and C.O. II Nicholas Soltas (collectively, the "State Defendants") have filed

---

[1] Service was not obtained on the "Unknown Correctional Officers." They will be dismissed from this case.

[2] Ortt resigned from State service on February 28, 2017 ECF No. 31-2 n.1.

a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 31, which is unopposed.[3]

This case is ready for adjudication. No hearing is required. *See* Local Rule 105.6 (D. Md. 2016). For reasons to follow, Krissi Cortez's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 15, is granted. The State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 31, is granted-in-part and denied-in-part.

## I. BACKGROUND[4]

Murphy alleges that on October 2, 2013, at approximately 10:00 a.m., Officer Ortt assaulted him by slamming Murphy's arm and hand in the tray slot of his cell door, and that he was denied immediate medical treatment. ECF No. 1 at 2–3. Murphy claims that Ortt wrote a "false report" to "cover it up." *Id.* at 3. Murphy was issued a Notice of Rule Violation for committing assault or battery on staff (Rule 101) and demonstrating disrespect or use of vulgar language (Rule 405). ECF No. 1-1. Ortt denies having assaulted Murphy and states that, in fact, he was assaulted by Murphy, who spit on his arm as Ortt gave him his food tray through the slot of the cell door. ECF No. 31-6 ¶ 4. Ortt states that Murphy's arm and hand had cleared the slot when he closed it. *Id.*

Murphy further alleges that at approximately 11:45 a.m. that morning, Ortt returned to Murphy's cell. While Murphy was "attending to his lacerations" from having his hand slammed in the door, Ortt allegedly opened the cell door slot and sprayed him with pepper spray for

---

[3] The Clerk notified Murphy of Cortez's and the State Defendants' dispositive motions and that he may file oppositions with declarations and exhibits. ECF No. 18, 32, 34. To date, the State Defendants' Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, ECF No. 31, remains unopposed.

[4] Murphy adopts and incorporates in his Complaint "some" of the original Complaint that he filed in *Murphy v. Ortt*, Civil Action No. WDQ-13-2990 ("*Murphy I*"); however, he does not specify which portions of the *Murphy I* Complaint he intends to incorporate. ECF No. 2 at 3 ¶ 1. Murphy later moved voluntarily to withdraw *Murphy I* without prejudice stating that he wanted to wait until his release and possible retention of counsel to pursue his claims, and the Court granted the Motion. *Murphy I*, ECF Nos. 16, 17.

"about 10 seconds[,] an excessive amount." ECF No. 1 at 3. Murphy asserts that Ortt wrote another "false Notice of Inmate Rule Violation" to justify his actions. *Id.* Ortt refutes this account, stating that Murphy was using the sink and toilet in his cell to flood the tier and that Murphy also was observed attempting to break a fire sprinkler in his cell. ECF No. 31-6 ¶ 5. Ortt states that he disbursed a single burst of pepper spray into the cell to subdue Murphy and prevent further damage. Murphy then complied with Ortt's order to come to the cell door slot to be handcuffed, and was escorted to the medical room. ECF No. 31-6 ¶¶ 5–6.

Murphy claims that Ortt and the other Defendants know that pepper spray symptoms can last forty-five minutes if left untreated. Murphy alleges that Ortt and Officer Soltas refused to offer him first aid and left him in his cell for four to five minutes. ECF No. 1 at 3. Murphy alleges that he tried to splash water into his eyes, but that the sink in the cell had been turned off by Defendants. Murphy states that his "only recourse was to place his head into the toilet to stop the burning to his eyes, body, and face," which caused his eyes to hurt for several days and his skin to peel. *Id.*

Murphy was eventually taken to the medical room where he was examined by Nurse Cortez. He claims that he could barely see, complained of pain, and was soaked in pepper spray. *Id.* at 3–4, 8. He claims that Cortez failed to flush his eyes with water, to wipe the pepper spray from his skin, or to ask the correctional officers whether he would receive a decontamination shower. *Id.* at 3–4. Murphy claims that he was "forced back" into his cell by correctional officers upon the orders of Lt. Gillum and Lt. Wilt.[5] Murphy claims that he was not provided a decontamination shower and states that he again used water in the toilet to wash off the pepper spray. *Id.* at 4.

---

[5] Lt. Wilt is not a Defendant in this case. Wilt was assigned to investigate the use of force incident, and concluded that staff actions were consistent with Department of Public Safety and Correctional Services (DPSCS) policies and procedures. ECF 31-17 ¶ 5.

3

Murphy further claims that on an unstated date his cellmate blocked the cell window and assaulted him.[6] When Officer Peters and other unknown officers arrived at the cell, they found him beaten and lying on the floor. Murphy alleges that an officer used a "stun shield"[7] on Murphy that "zapped" his already burning skin. *Id.* at 4. Murphy maintains that even if Peters was not the officer who used the stun shield, then Peters acted improperly by failing to stop its use. *Id.* Officer Peters states that on a date he cannot recall, the window of Murphy's cell was indeed covered. ECF No. 31-14 ¶ 4. Peters, with three other officers, entered the cell to check on him and found Murphy unresponsive on the cell floor. *Id.* Peters states that they walked over to Murphy, lightly tapped him on the shoulder, and that Murphy demonstrated verbally and physically that he was conscious and in no distress. The staff exited the cell without incident. Peters denies that on that occasion Murphy was "zapped," but states that the officers had a stun shield with them for their safety when they entered the cell. ECF No. 31-14 ¶ 6.

Murphy states that the excessive force that the officers allegedly used against him was the result of retaliation by Defendant Ortt against him for filing *Murphy v. Rounds*, Civil Action No. WDQ-13-2480. ECF No. 1 ¶ 10. Murphy alleges that Ortt retaliated against him "three times with authorization from his supervisor Lt. Wilt." *Id.*[8]

Lastly, Murphy alleges that NBCI Administrative Remedy Coordinator Jared Zais[9] and correctional staff use conspiratorial practices to violate his rights under the First Amendment,

---

[6] Murphy does not raise a failure to protect claim based on this alleged incident.

[7] Murphy explains that a stun shield is "a device similar to a standard hand-held shield utilized for cell extractions or tactical operations that is enhanced with an electrical grid on the contact surface that carries immobilizing current." ECF No. 1-5 at 1.

[8] Murphy also alleges here that NBCI medical staff do not report the use of excessive force or pepper spray because whatever "correctional staff says goes" even though it violates medical ethics, ECF No. 1 at 4 ¶ 8; that there is a climate of "racism and moral corruption" at NBCI that permits unchallenged use of pepper spray to let inmates know "who is the boss," *id.* ¶ 9; and that officers "get a kick" out of "confrontations with inmates" as if the inmates are there for their "devilish special use." *Id.* Murphy made nearly identical allegations in *Murphy v. Soltas, et. al*, Civil Action No. GJH-16-3077. Here, as in *Murphy v. Soltas*, the Court finds these generally stated and conclusory allegations, although disturbing, insufficient to premise a constitutional claim. They will not be further considered here.

[9] Murphy does not name Zais as a defendant.

4

including refusing to provide him with necessary documents and receipts used in processing Administrative Remedy Procedure (ARP) requests, fraudulently acting in the Warden's capacity to dismiss ARP requests, and reporting "false" information in the course of responding to an ARP request. ECF No. 1 at 5–6.

In his Complaint, Murphy seeks compensatory damages in the amount of $100,000 and punitive damages in the amount of $200,000 against each defendant. ECF No. 1 at 8.

## II. STANDARD OF REVIEW

Defendants' motions are styled as Motions to Dismiss, or in the Alternative, for Summary Judgment. If the Court considers materials outside the pleadings, as the Court does here, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When the moving party styles its motion as a "Motion to Dismiss, or in the Alternative, for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .,

admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The Court is mindful that Murphy is a *pro se* litigant. A federal court must liberally construe *pro se* pleadings to allow the development of potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Cruz v. Beto*, 405 U.S. 319 (1972). Liberal construction does not mean, however, that this Court can ignore a clear failure in the pleadings to allege facts sufficient to state a claim. *See Weller v. Department of Social Services*, 901 F.2d

6

387, 391 (4th Cir. 1990). A court cannot assume a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## III. DISCUSSION

### A. Claim Against Krissi Cortez

Murphy faults Nurse Cortez for failing to flush his eyes with water, wipe the pepper spray from his skin, or ask the correctional officers whether he would receive a decontamination shower, although he "complained of pain and was obviously soaked in pepper spray." ECF No. 1 at 3–4; ECF No. 19 at 2–3.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia.* 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that a defendant's actions or failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014). A "serious . . . medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the

7

official's action or inaction." *Jackson*, 775 F.3d at 178 (emphasis in original).

If the requisite subjective knowledge is established, an official may avoid liability "if [she] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In her declaration, Cortez attests to treating Murphy for pepper spray exposure on October 2, 2013. She observed three small abrasions on Murphy's right wrist, and that he was coughing and had nasal drainage due to chemical exposure. ECF No. 15-6 ¶ 5; *see also* ECF No. 17 at 15–16. Cortez took his vital signs, which were within normal limits. ECF No. 15-6 ¶ 5. Cortez states that upon completion of her examination of Murphy, correctional officers—not medical staff—"would have" provided decontamination showers. ECF No. 15-6 ¶ 8.

Cortez does not deny that Murphy complained of pain, that she failed to wash his eyes or skin, or that she failed to inquire if corrections staff would be providing a decontamination shower. For his part, Murphy fails to dispute that corrections staff, not medical staff, are responsible for providing inmates with decontamination showers. ECF No. 19 at 2–3. Even assuming that the pepper spray-related pain amounted to a serious medical need, Cortez's actions or failure to act were not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to constitute deliberate indifference. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Accordingly, the claim against Cortez will be dismissed.

### B. Claims against the State Defendants

Murphy alleges that the State Defendants used excessive force against him, denied him medical care, and unlawfully retaliated against him for filing a case in this Court by hindering his access to the ARP process. The State Defendants have filed a DVD, declaration, and verified records with their dispositive motion. ECF No. 31.

#### 1. Claims of Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). A court must look at "the need for application of force"; "the relationship between that need and the amount of force used"; "the extent of the injury inflicted"; "the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials"; and "any efforts made to temper the severity of the response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). "[I]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis and internal quotation marks omitted). However the use of pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and it may be used in order "to control recalcitrant inmates." *Williams*, 77 F.3d at 763 (quoting *Landman v. Peyton*, 370 F.2d 135, 138 & n.2 (4th Cir. 1966)). As with all excessive force claims, determining whether the amount of chemical agent used was appropriate focuses on whether a defendant acted with a sufficiently culpable state of mind: "wantonness in the infliction of pain." *Iko*, 535 F.3d at 239–40 (citations omitted)

9

(holding a correctional officer was not entitled to qualified immunity where an additional chemical agent was deployed into the inmate's cell after the inmate attempted to comply with officer's order, did not react violently, and the officer failed to remove inmate's clothes or secure medical care for inmate after chemical agent exposure).

An officer may be liable for Eighth Amendment violations when he or she deploys more than a reasonable amount of a chemical agent. *See, e.g., Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and other officer also joined in). However, when an inmate ignores official commands repeatedly, multiple applications of pepper spray have been found to be reasonable. *See Williams*, 77 F.3d at 759, 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 Fed. App'x 97, 99, 102–03 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell and did not demonstrate "more than de minimis injury").

### a. Slot Door Incident

Murphy first alleges that Ortt slammed the slot door of his cell on his arm, denied him medical treatment, and wrote a "false report" to justify the incident. ECF No. 1 at 3. Murphy does not state which hand and arm were involved or describe any resulting injury. Later that day, Murphy was examined by Nurse Cortez, who noted three superficial abrasions on Murphy's hand. ECF No. 15-6 at 2. The medical report does not indicate when the abrasions were made or indicate if Murphy had been assaulted. Murphy does not allege that these abrasions were the result of the purported slamming of the cell slot door on his arm.

Ortt disputes Murphy's account of the incident. He states that Murphy assaulted him by

10

spitting on his arm when he passed Murphy his meal through the door slot, and that Murphy said "Fuck you bitch next time I'll shit you down." ECF No. 31-6 ¶ 4; ECF No. 31-5. Ortt states that Murphy's hand and arm had cleared the slot door when he closed and locked the slot to prevent any further assault. *Id.* Viewing the facts in the light most favorable to Murphy, even if Murphy's hand was caught in the slot door, the Court finds that the facts are insufficient to support an Eighth Amendment claim for use of excessive force. Murphy does not claim that he sustained any injury, and when the nurse observed the superficial lacerations he did not attribute them to the assault by Ortt earlier that day. Accordingly, this claim will be dismissed

### b. Use of Pepper Spray

Ortt's declaration states that at approximately 11:45 a.m.[10] he observed water running from the area of Housing Unit # 1 Cell 1-B-57. ECF No. 31-6 at 1. Ortt and Officer Soltas observed Murphy using the toilet and sink to flood the tier, which caused them to disable the operation of the water in the cell. *Id.* at 2. Approximately fifteen minutes later, Soltas and Ortt saw Murphy standing on the toilet attempting to break a fire sprinkler. *Id.* When Ortt ordered Murphy to stop, Murphy responded "Fuck you Bitch," and continued tying a piece of cloth around the sprinkler head so that he could pull it from the wall. After Murphy refused the order to stop, Ortt disbursed a single burst of pepper spray into the cell to prevent further damage to the cell. *Id.* Murphy then complied with Ortt's orders and went to the door slot to be handcuffed. ECF No. 31-6 ¶ 5. Murphy was immediately escorted to the medical room for evaluation. ECF No. 31-6 ¶ 6.

The State Defendants' DVD of the incident,[11] recorded from the perspective of two stationary hall cameras, verifies Ortt's description of the incident. ECF No. 31-12. At

---

[10] His declaration does not specify whether this was in the morning or evening; the video discussed in further detail below clarifies that this was in the morning.

[11] Murphy viewed the DVD on July 27, 2017. ECF No. 33.

11

approximately 11:50 am, water can be seen leaking from a cell door. The water is leaking not only on the tier, but at one point cascades to the tier below. Staff can be seen trying to block water from seeping into cells on the tier below. Officers can be seen opening a closet near the cell, which appears to be where the water to the cells can be shut off. The water appears to stop leaking. The footage then shows two officers observing the inmate through the cell window. The officers' backs are to the cameras, so the Court cannot discern whether they were talking to Murphy. There is no sound on the recording.

At approximately 12:06 p.m., officers again approached the cell and put on safety masks. It appears that at this point pepper spray was administered, and Murphy and his cellmate went to the door slot to be handcuffed. Approximately two minutes later, the officers open the cell door and Murphy and his cellmate walk out of the cell in handcuffs without assistance or further incident. ECF No. 31-12. After the inmates leave their cell, a sanitation worker enters the cell with cleaning equipment.

The DVD footage directly refutes Murphy's allegations of excessive use of pepper spray or that Ortt and Soltas refused to offer him first aid and left him in his cell for "four or five minutes." ECF No. 1 at 3 ¶¶ 3–4. Murphy's exit from the cell was immediate, and it is clear that he was not deliberately left to suffer in his cell, which forced him to wash his face in the toilet.

It is not clear, however, whether Murphy was provided a decontamination shower after his medical examination and, if not, whether this omission was made with the deliberate intention to cause him to suffer unnecessary physical pain. Ortt's statement that Murphy was immediately escorted from the cell to the medical unit is supported by the video surveillance footage. ECF No. 31-6 ¶¶ 5–7. Of note, Ortt states, "I do not recall being present during Mr. Murphy's medical assessment. However, during the post pepper spay [sic] evaluation, medical

12

personal typically remove excess pepper spray from an inmate's body and cleanse their eyes and nasal passages." ECF No. 31-6 ¶ 6. Officer Soltas states that once Murphy was treated for pepper spray exposure by medical staff, Murphy refused to leave the medical room and had to be carried out by correctional staff to his cell. ECF No. 31-8 ¶ 4. Lt. Bradley Wilt acknowledges that on October 2, 2013, the water to Murphy's cell and three surrounding cells was temporarily disabled "to allow the flooding to the tier to be managed." ECF No. 31-17 ¶ 7. "Upon regaining control of the water situation, water was restored to the cells." *Id.*

Murphy claims that he was "forced back" into his cell without being given a decontamination shower, as ordered by Lt. Gillum and Lt. Wilt. ECF No. 1 at 4 ¶ 6. Murphy claims that he was again forced to use the toilet to wash off the pepper spray. ECF No. 1 at 4 ¶ 6. Lt. Gillum does not address this claim in his declaration, ECF No. 31-9, and the State Defendants provide no evidence that Murphy was offered a decontamination shower at any time. Further, their reliance on medical staff to perform decontamination on an inmate exposed to chemical agents is directly disputed by Defendant Cortez, who maintains that non-medical correctional staff are charged with the responsibility of providing the shower.

Later that day, Murphy was moved to a temporary holding cell and placed on suicide watch after he expressed thoughts of suicidal ideations. ECF No. 31-11 at 2. The temporary holding cell "would have had a toilet, a sink with running water and access to fresh air. This move occurred within three hours" of Murphy's exposure to pepper spray. ECF No. 31-17 ¶ 8.

In assessing the need for application of force, the relationship between that need and the amount of force applied, the extent of the injury inflicted, the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials, and any efforts made to temper the severity of the response, the Court finds that the use of pepper spray was not excessive. *Whitley,*

13

475 U.S. at 321. Murphy was engaged in behavior that had already flooded parts of the prison, and was attempting to further damage prison property. The amount of injury suffered by Murphy was low, as the use of pepper spray was limited to a single blast and Murphy was subsequently medically examined. However, given that there is no evidence that Murphy was offered or received a decontamination shower and Gillum's failure to address Murphy's allegation that, on his orders, Murphy was placed into a cell without running water and left there for several hours still suffering from pepper spray, there exist genuine disputes of material facts. Thus, summary judgment in favor of Lt. Gillum on this claim is inappropriate on the record now before the Court. Plaintiff, who is no longer incarcerated, will be given an opportunity to advise the Court whether he will be retaining counsel in this matter.

### c. Use of Stun Shield

Murphy claims that on an unspecified date, a stun shield was used against him causing extreme pain while he was lying prone in his cell; Officer Peters remembers the specific incident referenced by Murphy, but denies that a stun shield was used against Murphy. ECF No. 1 at 4; ECF No. 31-14 at 1. Officer Peters acknowledges, however, that officers brought a stun shield into the cell. *Id.* Both Peters and Murphy agree that when the officers came into Murphy's cell, Murphy was lying on the floor. ECF No. 1 at 4, ECF No. 31-14 at 1.

Defendants do not specifically argue that they are entitled to summary judgment regarding the alleged use of a stun shield by Officer Peters or one of the officers who accompanied him. *See* ECF No. 31-2 at 13–18. Here, there is a genuine dispute of material fact regarding whether officers used a stun shield against Murphy while he was lying down. Thus, Officer Peters is not entitled to summary judgment. Plaintiff, who is no longer incarcerated, will be given an opportunity to advise the Court whether he will be retaining counsel in this matter.

14

## 2. False Reports and Retaliation

Murphy claims that he was repeatedly retaliated against and that Ortt wrote a "false report" charging him with rule violations to cover up slamming the cell door on his arm. ECF No. 1 at 2–3. Although a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), "there are exceptions to this rule." *Cole v. Holloway*, 631 Fed. App'x 185, 186 (4th Cir. 2016) (citing *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989) (holding that a disciplinary charge may be actionable under § 1983 if retaliatory)).

To establish a claim of retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Importantly, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996), *judgment vacated on other grounds*, 525 U.S. 802 (1998) (conclusory allegations of retaliation insufficient to state claim). Furthermore, where "there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." *ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

To the extent Murphy claims he was denied ARP forms and receipts in violation of his right to access to the Courts under the First Amendment, his claim is unavailing. "To prevail on a claim that he was denied access to the courts, a prisoner must demonstrate that he suffered an

15

actual injury, such as missing a court-imposed deadline or being unable to file a complaint because of the Defendants' actions." *Pronin v. Johnson*, 628 Fed. App'x. 160, 161 (4th Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 351–52 (1996)); *see Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (requiring proof "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech" for a plaintiff to prevail on a First Amendment § 1983 retaliation claim). Murphy's vague and unsubstantiated allegations are insufficient to support a First Amendment retaliation claim. He fails to allege or demonstrate how the purported retaliation either adversely affected his ability to exercise his speech rights or his right to access the courts under the First Amendment. A bald assertion of retaliation without a showing of actual resulting injury is insufficient to state a claim. Here, Murphy's numerous active cases in this Court belies any plausible claim that he suffered "adversity" or his First Amendment right of access to the courts was in any way chilled as a result.

### C. Qualified Immunity

The State Defendants argue that they are entitled to qualified immunity as an affirmative defense, but do not specifically articulate which rights were not clearly established. ECF No. 31 at 29–31. As discussed above, genuine issues of disputed fact exist in regard to Murphy's claim that the effects of the pepper spray were not properly remedied by Gillum, and that a stun shield was used on him while he was laying on the ground. Murphy had a clearly-established right not to be put in a cell without running water after he had been exposed to pepper spray, and not to have a stun shield used against him while he was laying on the ground. In *Wagner v Warden*, Case No. ELH-14-791, 2016 WL 7178297 (D. Md. Dec. 8, 2016), Judge Hollander denied a similar request for qualified immunity reasoning that, in 2013, it was clear that the Eighth Amendment may be violated if, after exposure to pepper spray, "a prison inmate is not provided

16

with the opportunity to shower or wash off the offending substance, at least when it is safe to do so." *Id.* at *12. Furthermore, the Court finds that it was clearly established in 2013 that using a stun shield against a prone inmate who was not resisting prison guards constituted a violation of an inmate's constitutional rights. *See Thompson v. Virginia*, 878 F.3d 89 (4th Cir. 2017) (denying claim of qualified immunity stemming from 2010 events, and reasoning that it was clearly established that infliction of pain and suffering violates the Eighth Amendment where "the victim is restrained, compliant, and incapable of resisting or protecting himself, and otherwise presents no physical threat in any way"). Thus, Gillum and Peters are not entitled to qualified immunity.

## IV. CONCLUSION

For the reasons discussed above, the Court grants Krissi Cortez's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. The Court partially grants the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, but will deny it as to the claim that Lt. Gillum ordered Murphy placed back into a cell without running water or providing him with a decontamination shower after he was exposed to pepper spray, and that Officer Peters used a stun shield on Murphy while he was laying in his cell. A separate Order follows.

Dated: March 26, 2018

GEORGE J. HAZEL
United States District Judge

17